UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BERTHA ANN LONGORIA, | No. 1:19-cv-00014-GSA |
| Plaintiff, | |
| v. | **ORDER DIRECTING ENTRY OF JUDGMENT IN FAVOR OF COMMISSIONER OF SOCIAL SECURITY AND AGAINST PLAINTIFF** |
| ANDREW SAUL, Commissioner of Social Security, | |
| Defendant. | |

I.      **Introduction**

Plaintiff Bertha Ann Longoria ("Plaintiff") seeks judicial review of the final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying her application for disability insurance benefits pursuant to Title II of the Social Security Act.  The matter is currently before the Court on the parties' briefs which were submitted without oral argument to the Honorable Gary S. Austin, United States Magistrate Judge.[1]  *See* Docs. 16, 17 and 20.  Having reviewed the record as a whole, the Court finds that the ALJ's decision is supported by substantial evidence and applicable law. Accordingly, Plaintiff's appeal is denied.

///

---

[1] The parties consented to the jurisdiction of the United States Magistrate Judge.  *See* Docs. 11 and 12.

## II.      Procedural Background

On March 12, 2015, Plaintiff filed an application for disability insurance benefits alleging disability beginning March 6, 2015.  AR 20.  The Commissioner denied the application initially on July 20, 2015, and following reconsideration on December 18, 2015.  AR 20.

On February 19, 2016, Plaintiff filed a request for a hearing.  AR 20.  Administrative Law Judge  Ruxana Meyer presided over an administrative hearing on November 8, 2017.  AR 38-73.  Plaintiff appeared and was represented by an attorney.  AR 38.  On March 2, 2018, the ALJ denied Plaintiff's application.  AR 20-31.

The Appeals Council denied review on October 25, 2018.  AR 5-9.  On January 3, 2019, Plaintiff filed a complaint in this Court.  Doc. 1.

## III.     Factual Background

### A.  Plaintiff's Testimony

Plaintiff (born November 1960) reported pain in her knees, feet, shoulders and lower back. AR 58, 64.  She had high blood pressure and an elevated heart rate.  AR 65.  Her medications caused dizziness, disorientation, forgetfulness, visual disturbances, cold sweats, sleepiness and fatigue.  AR 65-66.

In or before 2000, Plaintiff was diagnosed with fibromyalgia which she treated with time-release oxycodone and Tylenol with codeine.  AR 59.  In 2008, doctors replaced Plaintiff's left knee.  AR 62-63.  Plaintiff continued to experience left knee inflammation, pain and swelling.  AR 63.  She needed knee surgery for her right knee which had "no more cartilage."  AR 62.  Although she had right shoulder surgery in 2013, Plaintiff continued to wear a brace as needed for pain.  AR 58.  She also wore a brace on her left shoulder while she awaited surgery for a torn rotator cuff.  AR 58.

Plaintiff had a daily home exercise program consisting of stretching exercises.  AR 61.  Plaintiff testified that the exercises did not relieve her pain but caused more inflammation.  AR 61.  Plaintiff was also supposed to be walking for exercise but did so infrequently because of her knee pain.  AR 62-63.  In addition, Plaintiff could only walk when someone was available to accompany her because she frequently fainted.  AR 63.

Plaintiff took anti-depressive and anxiety medications daily, which helped with her symptoms except for flashbacks.  AR 60-61.  Plaintiff also took nitroglycerin.  AR 61.  In April 2017, Plaintiff had an unsuccessful angiogram which could not proceed because the artery was too small to allow insertion of a stent.  AR 62.

Plaintiff testified that she could sit for fifteen to twenty minutes before experiencing pain.  AR 64.  She could no longer hold a book so she listened to her Bible using her phone.  AR 65.

## B.   Medical Records

### 1.   Cardiac and Circulatory Disorders

In January 2014, Plaintiff received emergency treatment for acute coronary syndrome/NSTEMI.[2]  AR 365.  Plaintiff experienced a prior episode of acute coronary syndrome in 2006, which was categorized as a hypertensive emergency.  AR 365.  Cardiologists at the Visalia Medical Clinic provided treatment following the 2014 episode.  AR 353-77.  In August 2014, George Madera, M.D., examined Plaintiff and noted that her physical condition was generally normal, although she was stressed and tearful.  AR 365-68.

In March 2015, Plaintiff returned to the emergency room with chest pain.  AR 357.  At the follow-up appointment, Ashkan Attaran, M.D., noted that the chest pain had resolved and that Plaintiff had a negative stress test.  AR 360.  He noted that Plaintiff would be followed closely since further chest pain might indicate a need for left heart catheterization.  AR 360.  In April 2015, Plaintiff's chest pain was increasing upon exertion, and Dr. Attaran prescribed sublingual nitroglycerine and ordered cardiac catheterization.  AR 356.

An angiogram was performed in April 2015. AR 861-76.  As part of the surgery Dr. Attaran performed a balloon angioplasty.  AR 869.

The record includes notes of monthly cardiology treatment from May 2015 to October 2015.  AR 635-80.  In September 2015, Dr. Attaran noted a single episode of fainting (syncope),

---

[2]  Acute coronary syndrome (ACS) is a mismatch of myocardial oxygen demand and myocardial oxygen consumption commonly referred to as a heart attack.  Non-ST segment elevation myocardial infarction (NSTEMI) is one of several subgroups of ACS.  Although patients may experience different symptoms, NSTEMI typically presents as "a pressure-like substernal pain" lasting for more than ten minutes that may radiate to the arm, neck or jaw.  Hajira Basit, Ahmad Malik and Martin B. Huecker, Non ST Segment Elevation Myocardial Infarction (May 4, 2020),  ncbi.nlm.nih.gov/books/NBK513228// (accessed June 10, 2020).

likely due to an excessive dose of Ranexa, a medication for chest pain so he reduced the dosage. AR 650, 653.  In October 2014, Plaintiff continued to experience chest pain, exertional shortness of breath and fatigue without fever or chills.  AR 641.  Plaintiff had no further fainting episodes following a prescription of Imdur.  AR 641.

A nuclear stress test in October 2016 indicated a normal heart size.  AR 950.  Plaintiff experienced no pain but experienced chest tightness, headache and a wei[r]d feeling.  AR 950. Her blood pressure response was normal.[3]  AR 950.

### 2.    Orthopedic Disorders

In April 2014, at a six-month follow-up of right shoulder rotator cuff repair and biceps tenotomy, Malcolm Ghazal, M.D., noted that Plaintiff continued to report discomfort.  AR 319. He suggested that Plaintiff's fibromyalgia could be complicating her rehabilitation and noted that other medical issues following surgery had interfered with her progress in physical therapy.  AR 319.  However, the doctor also opined that Plaintiff's slow improvement  after surgery was "effort related."  AR 320.  Examination revealed 60% active and 90% passive range of motion.  AR 320. Motor strength was 4 to 4+/5.  AR 320.  Dr. Ghazal encouraged "enthusiastic" home rehabilitation.  AR 320.

In May 2014,  Plaintiff saw Dr. Ghazal following a fall on her left knee.  AR 321-22. After reviewing the x-rays (AR 479), the doctor diagnosed a contusion injury with no fracture or damage to her prosthesis and recommended rest and physical therapy to speed up recovery.  AR 322.  In June 2014, Plaintiff continued to complain of knee pain.  AR 323.  Although the knee remained tender, Dr. Ghazal observed a good range of motion and 4/5 motor strength.  AR 324. He also encouraged Plaintiff to stretch and exercise her right shoulder.  AR 324.

An April 2015 appointment for pain medication management noted chronic knee and shoulder pain, then rated 8/10 although typically 5-6/10.  AR 407, 410.  Plaintiff continued to benefit from Tramadol.  AR 407, 410.  Level of function had improved since the last

///

---

[3] Primary care physician Luis Guzman, M.D., characterized the test results as indicating "no further damage to the heart."  AR 952.

appointment.  AR 407.  Physical therapy in January 2014 had not helped Plaintiff and she now declined physical therapy and injections.  AR 407.

In July 2016, orthopedist Christopher A. Verioti, D.O., examined Plaintiff following several months of left elbow and forearm pain.  AR 977-79.  The examination revealed swelling and tenderness.  AR 977.  X-rays and magnetic resonance imaging in August 2016 revealed tendinosis and peri-tendinitis of the distal biceps tendon without rupture.  AR 972-76..  In September 2016, Dr. Verioti noted that Plaintiff's left arm pain had improved with use of a counterstrap brace.  AR 963.  Dr. Verioti prescribed Voltaren gel and a home exercise regimen.  AR 963.

While giving her dogs water in April 2017, Plaintiff fell, hitting her head, spraining or straining her neck and breaking both wrists.  AR 826-60.  Emergency department personnel found that her blood pressure was out of control.  AR 849-51.

### 3. Mental Health and Neurological Disorders

In September 2014, Plaintiff consulted psychiatrist Dwight W. Sievert, M.D., for worsening depression.  AR 396-97.  In an initial interview with Deborah Moore, N.P., Plaintiff recounted a history of childhood abuse.  AR 396.  She displayed a range of affect, both normal and sobbing.  AR 396.  In consultation with Dr. Sievert, Ms. Moore diagnosed severe major depression, single episode, without psychotic features, and prescribed Brintellix (an antidepressant).  AR 396.  In addition to Ms. Moore's coordination of Plaintiff's medication, Sue Enterline, L.C.S.W., provided twice monthly psychotherapy.  AR 392.

In October 2014, Plaintiff reported bursting into tears at work while dealing with a difficult customer.  AR 394. Ms. Moore completed a form to authorize a reduced workday for Plaintiff.  AR 395.

In December 2014, despite adjustments in dosage, Plaintiff reported no effect from Brintellix, and Ms. Moore initiated a trial of Pristique.  AR 395, 394.  Plaintiff's diagnosis was revised to include both severe recurrent major depression without psychotic features and

///

///

1  pseudobulbar affect.[4]  AR 393. Ms. Moore prescribed Nuedexta (dextromethorphane and

2  quinidine) to treat pseudobulbar affect.  AR 392.

3        In March 2015, Plaintiff reported extensive stress and increased anxiety resulting from

4  increases in her case load at work despite existing provisions for a reduced case load.  AR 390.

5  Following emergency treatment for chest pain later in March, Plaintiff stopped working and

6  planned to retire on disability.  AR 389.

7                      **4.    Pain Management**

8        At a routine appointment in August 2014, Plaintiff spoke with Julie Howelson, F.N.P.,

9  concerning her pain, anxiety and depression.  AR 468.  Ms. Howelson noted:

10             [Patient] presents with complaint of generalized pain.  Has been
              using tramadol for fibromyalgia.  Has been under stress related to
11             work demands.  States she has not been sleeping well and is tired and
              it makes her fibromyalgia worse.  Denies chest pain or shortness of
12             breath.  States the pain hurts her all day.  Is crying and upset and
              states it is because of the pain and she cannot keep up at work.  Has
13             missed a few days of work the past few weeks due to recurrent
              abdominal pain.  Has not been to a pain specialist.  [Patient] states
14             she cries every day and she hasn't been to a counselor.  States she
              has had some childhood issues and other stressful situations in her
15             life.

16        AR 468.

17        Although Plaintiff was sad and tearful, in Ms. Howelson's opinion, Plaintiff's thought

18  process was appropriate and she was able to make sensible decisions.  AR 471.  Because

19  Plaintiff's blood pressure was 190/116, Ms. Howelson contacted Plaintiff's cardiologist to see her

20  sooner than her next appointment.  AR 471.  She provided a doctor's excuse so that Plaintiff

21  could take the next day off of work.  AR 473.

22        Beginning in September 2014, Plaintiff received pain management services from

23  Adventist Health Spine and Pain to address fibromyalgia and chronic knee and shoulder pain.

24  AR 407-10, 427-30, 448-59, 691-713, 720-23, 736-39, 749-52, 770-81, 883-903, 911-30, 942-48,

25  ///

26  ---

[4] Pseudobulbar affect is a disinhibition syndrome, frequently associated with other neurological disorders, in which
27  the neurological pathways involving serotonin and glutamate are disrupted.  The syndrome is characterized by
    uncontrollable laughing or crying that is disproportionate or inappropriate to the circumstances.  *See* Aiesha Ahmed
    and Zachary Simmons, Pseudobulbar Affect: Prevalence and Management, 2013 Ther. Clin. Risk Manag. 9:483-89,
28  reproduced at ncbi.nlm.nih.gov/pmc/articles/PMC3849173 (accessed June 10, 2020).

957-62, 985-1002, 1025-45, 1083-99, 1103-40.  Plaintiff declined offers of physical therapy and injections.  AR 720, 736.

In October 2016, Villja Abrute, N.P., noted that Plaintiff's left arm pain had improved with the use of Voltaren gel and a brace.  AR 957.

In May and July 2017, Lucia Thompson, N.P., noted normal range of motion, no swelling and normal gait.  AR 895.  Plaintiff was in no acute distress, did not exhibit pain behavior while seated and moved about the room easily.  AR 894, 901.

In October 2017, Plaintiff complained of whole body pain.  AR 883.  Ms. Thompson observed normal strength, gait and range of motion except for minimal tenderness and limited range of motion in the lumbar back..  AR 887.  Ms. Thompson encouraged Plaintiff to continue exercise and stretching and to limit her intake of sugary foods and beverages.  AR 889.

### 5.      Primary and Other Care

The record includes extensive examination notes of Plaintiff's primary care physicians Yong-Sik Kim, M.D., and Luis A. Guzman, M.D., and their associates and staff at Adventist Health beginning in April 2014.  AR 537-634, 714-19, 724-27, 740-48, 753-63, 766-69, 782-87, 801-12, 818, 904-10, 931-41, 952-56, 966-70, 1006-11, 1076-82.  Plaintiff's representations of her current health varied from visit to visit.  In October 2015, Plaintiff's high blood pressure and hyperlipidemia were controlled by medication.  AR 542.  Generally, coronary artery disease and chest pain, both followed by a cardiologist, were stable.  AR 542.  Fibromyalgia and insomnia due to pain were followed by a pain specialist and were stable.  AR 542.  Depression, followed by a psychiatrist, was also stable.  AR 542.

In March 2017, Dr. Guzman performed a detailed physical examination.  AR 907.  He noted that her hypertension was improving and fibromyalgia was well controlled.  AR 907.  Plaintiff denied chest pain, dizziness, headaches, blurred vision and any mental health symptoms other than slight nervousness.  AR 907.  Plaintiff had gained six pounds in the prior three months, did not exercise regularly and consumed a limited diet.  AR 907.

In April 2017, Dr. Guzman saw Plaintiff for a follow-up of chronic depression and anxiety.  AR 904.  Medicating Plaintiff's anxiety was difficult due to interactions between

1   medications to address her angina (metoprolol) and pain relief prescribed following the fall in

2   which Plaintiff broke her wrists.  AR 904.  Since her fall, Plaintiff had experienced swelling of

3   her lower extremities and weight gain possibly attributable to the casts on her arms.  AR 904.  Dr.

4   Guzman noted that Plaintiff disclosed that she did not exercise on a regular basis and consumed a

5   limited diet.  AR 904.  She was prediabetic and deficient in vitamin D.  AR 904, 905.

6       **IV.**    **Standard of Review**

7       Pursuant to 42 U.S.C. §405(g), this court has the authority to review a decision by the

8   Commissioner denying a claimant disability benefits.  "This court may set aside the

9   Commissioner's denial of disability insurance benefits when the ALJ's findings are based on

10  legal error or are not supported by substantial evidence in the record as a whole."  *Tackett v.*

11  *Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted).  Substantial evidence is evidence

12  within the record that could lead a reasonable mind to accept a conclusion regarding disability

13  status.  *See Richardson v. Perales*, 402 U.S. 389, 401 (1971).  It is more than a scintilla, but less

14  than a preponderance.  *See Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir. 1996) (internal citation

15  omitted).  When performing this analysis, the court must "consider the entire record as a whole

16  and may not affirm simply by isolating a specific quantum of supporting evidence."  *Robbins v.*

17  *Social Security Admin.*, 466 F.3d 880, 882 (9th Cir. 2006) (citations and internal quotation marks

18  omitted).

19      If the evidence reasonably could support two conclusions, the court "may not substitute its

20  judgment for that of the Commissioner" and must affirm the decision.  *Jamerson v. Chater*, 112

21  F.3d 1064, 1066 (9th Cir. 1997) (citation omitted).  "[T]he court will not reverse an ALJ's

22  decision for harmless error, which exists when it is clear from the record that the ALJ's error was

23  inconsequential to the ultimate nondisability determination."  *Tommasetti v. Astrue*, 533 F.3d

24  1035, 1038 (9th Cir. 2008) (citations and internal quotation marks omitted).

25      **V.**    **The Disability Standard**

26      To qualify for benefits under the Social Security Act, a plaintiff must
        establish that he or she is unable to engage in substantial gainful
27      activity due to a medically determinable physical or mental
        impairment that has lasted or can be expected to last for a continuous
28      period of not less than twelve months.  42 U.S.C. § 1382c(a)(3)(A).

8

> An individual shall be considered to have a disability only if . . . his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §1382c(a)(3)(B).

To achieve uniformity in the decision-making process, the Commissioner has established a sequential five-step process for evaluating a claimant's alleged disability. 20 C.F.R. §§ 416.920(a)-(f). The ALJ proceeds through the steps and stops upon reaching a dispositive finding that the claimant is or is not disabled. 20 C.F.R. §§ 416.927, 416.929.

Specifically, the ALJ is required to determine: (1) whether a claimant engaged in substantial gainful activity during the period of alleged disability, (2) whether the claimant had medically determinable "severe impairments," (3) whether these impairments meet or are medically equivalent to one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1, (4) whether the claimant retained the residual functional capacity ("RFC") to perform his past relevant work, and (5) whether the claimant had the ability to perform other jobs existing in significant numbers at the national and regional level. 20 C.F.R. § 416.920(a)-(f).

**VI.    Summary of the ALJ's Decision**

The Administrative Law Judge found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of March 6, 2015. AR 22. Her severe impairments included: tendinosis of the left elbow; status post right rotator cuff repair; status post bilateral wrist fractures; ischemic heart disease; hypertension; depression; and, anxiety. AR 22. None of the severe impairments met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526). AR 24.

The ALJ concluded that Plaintiff had the residual functional capacity to perform work as follows: lift and carry five pounds frequently and ten pounds occasionally; stand and walk two hours in an eight-hour workday; and, sit six hours in an eight hour workday. AR 25. Plaintiff could not do over shoulder reaching or overhead reaching bilaterally. AR 25. Plaintiff could

9

1  frequently climb but should avoid ropes, ladders and scaffolds.  AR 25.  She could frequently

2  balance, kneel and crouch, and occasionally stoop and crawl.  AR 25.  Plaintiff could do work

3  which permitted an option to change positions between sitting, standing and walking every hour

4  for fifteen minutes assuming normal breaks.  AR 25.  She could not do production pace work as

5  on an assembly line.  AR 25.  She could have no exposure to hazards such as unprotected heights,

6  moving machinery or commercial driving.  AR 25.

7        Plaintiff was able to perform her past relevant work as a policyholder information clerk,

8  accounting clerk and eligibility worker.  AR 29.  Accordingly, the ALJ found that Plaintiff was

9  not disabled at any time from March 6, 2015, the alleged disability onset date, through March 2,

10  2018, the date of the decision.  AR 30.

11        **VII.   Plaintiff's Contentions on Appeal, In General**

12        In a single issue, Plaintiff contends that the ALJ failed to properly determine that her

13  mental health problems of anxiety and depression were severe impairments at steps two and four,

14  and further that the ALJ failed to consider Plaintiff's severe mental health impairments in the

15  context of her physical and mental impairments as a whole. Plaintiff also contends that because of

16  Plaintiff's severe mental health problems, the ALJ erred in concluding that Plaintiff's residual

17  functional capacity was sufficient to perform her prior work as a policy information clerk,

18  accounting clerk and eligibility worker.

19        The Commissioner counters that the ALJ properly determined that Plaintiff's depression

20  and anxiety did not cause more than a minimal limitation in Plaintiff's ability to perform her prior

21  work.  The Commissioner adds that Plaintiff failed to carry her burden of proving more stringent

22  mental limitations.

23        The Court finds that the parties' attempt to consider all of Plaintiff's contentions in a

24  single narrative to be imprecise and frequently confusing.  Accordingly, this decision will analyze

25  Plaintiff's claims in the context of each step of the Social Security disability analysis, as set forth

26  in 20 C.F.R. §§ 416.920(a)-(f) (*see above*).

27  ///

28  ///

1

2

**VIII.   Step Two: Did the ALJ Properly Categorize Plaintiff's Mental Impairments as Severe?**

3

4

5

6

7

8

9

10

Plaintiff acknowledges that the ALJ included her mental health limitations among her severe impairments at step two, but characterizes that finding as a "throwaway line" since application of the psychiatric review technique resulted in her mental health impairments being considered non-severe.  The Commissioner responds that the ALJ properly found Plaintiff's anxiety and depression to be non-severe.  In their attempts to address steps two and four as a single determination, and in their failure to distinguish the differing nature of the severity determinations made at step two and step three, the parties fail to focus on what the ALJ must determine at step two of the disability analysis.

11

12

13

14

15

16

17

18

19

20

At step two, the Commissioner determines whether the claimant has a medically severe impairment or combination of impairments.  *Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987); 20 C.F.R. §416.920(a)(4)(ii).  An impairment is a medically determinable physical or mental impairment or combination of physical or mental impairments.  20 C.F.R. § 416.902(f).  If a claimant does not have an impairment or combination of impairments which significantly limit the claimant's physical or mental ability to do basic work activities, the Commissioner will find that the claimant does not have a severe impairment.  20 C.F.R. § 416.920(c).  As stated above, the ALJ specified that Plaintiff's severe impairments in combination included: tendinosis of the left elbow; status post right rotator cuff repair; status post bilateral wrist fractures; ischemic heart disease; hypertension; depression; and, anxiety.  AR 22.

21

22

23

24

25

26

27

"The step-two inquiry is a de minimus screening device to dispose of groundless claims." *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996).  "It is not meant to identify the impairments that should be taken into account when determining the RFC."  *Buck v. Berryhill*, 869 F.3d 1040, 1048-49 (9th Cir. 2017).  An impairment or combination of impairments can be found 'not severe' only if the evidence establishes a slight abnormality that has no more than a minimal effect on an individual['s] ability to work."  *Id.* at 1290; SSR 85-28.  "[T]he severity regulation is to do no 'more than allow the Secretary to deny benefits summarily to those

28

applicants with impairments of a minimal nature which could never prevent a person from working.'"  SSR 85-28 (quoting *Baeder v. Heckler*, No. 84-5663 (3d Cir. July 24, 1985)).

Even if an individual impairment is not sufficiently serious to prevent a person from working, an ALJ must consider the combined effect of all of the claimant's impairments on his/her ability to function as well as considering the claimant's subjective symptoms, such as pain or fatigue.  *Smolen*, 80 F.3d at 1290.  "If such a finding is not clearly established by medical evidence, however, adjudication must continue through the sequential evaluation process."  SSR 85-28.  The ruling warned:

> Great care should be exercised in applying the not severe impairment concept.  If an adjudicator is unable to determine clearly the effect of an impairment or combination of impairments on the individual's abilities to do basic work activities, the sequential evaluation process should not end with the not severe evaluation step.  Rather, it should be continued.  In such a circumstance, if the impairment does not meet or equal the severity level of the relevant medical listing, sequential evaluation requires that the adjudicator evaluate the individual's ability to do past work, or to do other work based on the consideration of age, education, and prior work experience.

SSR 85-28.

For example, Ms. Smolen suffered from childhood cancer that resulted in the loss of one kidney, loss of part of her left lung, changes in her remaining lung tissue, mild anemia, suppression of bone marrow production, and spinal scoliosis, all of which led to severe fatigue and back pain.  *Smolen*, 80 F.3d at 1290.  The ALJ found only a single severe impairment, "slight scoliosis," which limited her ability to walk and sit.  *Id.*  The step two analysis disregarded Ms. Smolen's subjective symptoms when determining severity.  *Id.*  The Ninth Circuit rejected the step two analysis: "Having found Smolen to suffer from only one "severe" impairment at step two, the ALJ necessarily failed to consider at step five how the combination of her other impairments—and resulting incapacitating fatigue—affected her residual functional capacity to do work."  *Id.* at 1291.

In this case, the ALJ did not repeat the error made in *Smolen*.  Instead, her step-two finding, set forth in boldface type at the top of the analysis, found a collection of Plaintiff's impairments to be severe in combination.  However, the ALJ did not then stop her step two

1   analysis and proceed to step three.  Instead, the ALJ continued the analysis to consider whether

2   Plaintiff's depression and anxiety met the severity requirements applicable to "listed

3   impairments."  By performing the psychiatric review technique set forth in 20 C.F.R., Part 404,

4   Subpart P, Appendix 1, the ALJ concluded that Plaintiff's depression and anxiety were not

5   severe, seemingly contradicting her own step two determination that these mental health

6   impairments were severe.  AR 23-24.

7        Despite the Commissioner's contention that the listing analysis appropriately included in

8   the step two analysis, the ALJ erred in addressing the two differing standards at step two. The

9   hearing decision itself recognizes that whether any severe impairment meets or is medically

10  equivalent to one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1 is

11  to be determined at step three.  The step two analysis considers only whether each of the

12  applicant's impairments meets the *de minimus* standard of severity applicable at step two.  *See*

13  AR 24-25.  The impairments that meet the conditions outlined in the step three "Listing of

14  Impairments" are those considered so severe that they are presumed disabling, without any

15  specific finding whether the claimant retains the ability to perform his prior work or any other

16  jobs.  *Lester v. Chater*, 81 F.3d 821, 828 (9th Cir.1995) (citing 20 C.F.R. §404.1520(d)).   In other

17  words, a claimant is found to be conclusively disabled at step three if her condition meets or

18  exceeds a listed impairment.  *Id.*

19       Under the regulations, an ALJ proceeds to analyze a mental impairment at step three only

20  after he or she has determined at step two that the mental impairment meets the step two severity

21  test.  *Keyser v. Comm'r, Soc. Sec. Admin.*, 648 F.3d 721, 725 (9th Cir. 2011).   Accordingly, the

22  ALJ erred in evaluating whether Plaintiff's condition satisfied a listing in the context of the step

23  two severity analysis.  By doing so, the ALJ confused the severity required to meet the listing at

24  step three, which is set forth in the listing itself, with the *de minimus* severity requirement of step

25  two, which is set forth in 20 C.F.R. §416.920(a)(4)(ii).  Moreover, the step two analysis concerns

26  only whether the claimant's impairment meets the *de minimus* severity standard needed to

27  proceed to further analysis, not the step three standard in which the severity of the particular

28  ///

1    impairment is considered in the context of the more complex determination of whether the

2    claimant's impairment is so severe that she is entitled to benefits without further analysis.

3            The ALJ's error at step two does not require reversal.  Despite finding Plaintiff's mental

4    health impairments to be severe in the heading of the step two analysis, while not severe in the

5    step three listing analysis that was included as part of step two, the ALJ carefully considered the

6    evidence as a whole at step four including evidence relating to Plaintiff's mental health

7    impairments.  *See* AR 25-29.

8            "In assessing RFC, the adjudicator must consider limitations and restrictions imposed by

9    all of an individual's impairments, even those that are not 'severe.'"  *Buck*, 869 F.3d at 1049

10   (quoting *Titles II & XVI: Assessing Residual Functional Capacity in Initial Claims*, SSR 96-8p)

11   (internal quotations omitted).  As a result, a claimant's residual functional capacity should be the

12   same whether or not certain impairments are considered severe at step two.  *Buck*, 869 F.3d at

13   1049.  Because the ALJ ultimately included Plaintiff's mental health impairments in determining

14   Plaintiff's residual functional capacity, the step two error was harmless.

15           **IX.     Sufficient Evidence Supported the ALJ's Determination at Step Four**

16           Plaintiff further contends that the ALJ's determination of her residual functional capacity

17   did not accurately consider the severity of Plaintiff's mental health impairments.  The

18   Commissioner emphasizes that despite considering Plaintiff's mental health impairments in the

19   context of her impairments as a whole, the ALJ correctly found Plaintiff's mental health

20   impairments to be mild.

21           **A.  Medical Opinions**

22           The administrative record includes physicians' notes from numerous and frequent medical

23   appointments, but little expert opinion interpreting the meaning of these records.  The medical

24   opinions are limited to the following:

25           **1.  Agency Physicians**

26           On initial review, agency psychological consultant Preston Davis, Psy.D., found

27   Plaintiff's claimed functional limitations to be disproportionate to the objective medical record.

28   AR 80.  Her fibromyalgia was stable.  AR 80.  Her high blood pressure and hyperlipidemia were

controlled by medication.  AR 80.  Gait and strength were normal after knee replacement.  AR 80.

Similarly, following her 2013 shoulder surgery, Plaintiff's condition and function had improved.

AR 80, 81.  Plaintiff experienced a myocardial infarction (heart attack) in 2013.  AR 80. Because

cardiac catheterization had been unsuccessful Plaintiff was being managed with medication.  AR

80.  Dr. Davis opined that Plaintiff had the residual functional capacity to perform light work with

restrictions on right overhead reaching.  AR 80.

Dr. Davis also noted that Plaintiff had declined physical therapy and injections for pain.

AR 80.  Plaintiff had a history of depression and anxiety.  Although psychotherapy had been

beneficial, Plaintiff had discontinued treatment.  AR 80.  Plaintiff's pain diminished her memory

and concentration, and her pain medications impaired her ability to pay attention.  AR 80.

Nonetheless, Dr. Davis opined that Plaintiff was able to perform simple repetitive tasks.  AR 80

Medical consultant Alan J. Coleman, M.D., agreed that Plaintiff's high blood pressure

was successfully controlled with medication.  AR 80-81.  Despite reports of chest pain,

angiograms in 2006 and 2014 ruled out coronary artery disease.  AR 80-81.  Plaintiff had

recovered well from 2014 rotator cuff surgery and demonstrated good range of motion.  AR 81.

Her repeated complaints of total body pain were not supported by specific findings.  AR 81.

Complaints of chronic low back pain were not medically supported since examinations were

normal and the evidence showed no findings of sciatica or nerve impingement.  AR 81.

Dr. Coleman opined that Plaintiff could lift and carry 25 pounds occasionally and ten

pounds frequently; could sit, stand or walk for about six hours in an eight-hour workday; could

not lift above the shoulder level bilaterally; could frequently climb ramps and stairs, balance,

kneel and crouch; and, could occasionally climb ladders, ropes or scaffolds, stoop or crawl.  AR

83-85.

On reconsideration, E. Aquino-Caro, M.D., and I. Ocrant, M.D., agreed with the initial

opinions of Drs. Davis and Coleman.  AR 94-95, 96-98.

## 2.  <u>Mental Health Source Statements</u>

On May 11, 2015, Plaintiff's psychotherapist, Sue Enterline, L.C.S.W., provided a letter

generally summarizing her treatment of Plaintiff, which consisted of ten sessions beginning in

15

1   October 2014.  AR 530.  Noting Plaintiff's history of severe childhood abuse, Ms. Enterline

2   diagnosed Plaintiff with post-traumatic stress disorder and major depression.  AR 530.  In April

3   2015, Plaintiff cancelled her last appointment due to an unrelated medical procedure and did not

4   return to therapy.  AR 530.  Ms. Enterline opined that Plaintiff would benefit from further

5   sessions.[5] AR 530.

6        In a letter dated March 2017, Nurse Moore reported that she was treating Plaintiff for

7   severe recurrent major depression, posttraumatic stress disorder, panic disorder and pseudobulbar

8   effect.  AR 824.  These ailments could not be cured, and the only treatments were daily

9   medication and psychotherapy.  AR 824.  Accordingly, Plaintiff's mental health ailments were

10  considered life-long.  AR 824.  In Nurse Moore's opinion, Plaintiff was "unable to work due to

11  permanent disability."  AR 824.

12                **B.**        **Determining Residual Functional Capacity**

13       "Residual functional capacity is an assessment of an individual's ability to do sustained

14  work-related physical and mental activities in a work setting on a regular and continuing basis."

15  SSR 96-8p.  The residual functional capacity assessment considers only functional limitations and

16  restrictions which result from an individual's medically determinable impairment or combination

17  of impairments.  SSR 96-8p.

18       A determination of residual functional capacity is not a medical opinion, but a legal

19  decision that is expressly reserved for the Commissioner. See 20 C.F.R. §§ 404.1527(d)(2) (RFC

20  is not a medical opinion), 404.1546(c) (identifying the ALJ as responsible for determining RFC).

21  "[I]t is the responsibility of the ALJ, not the claimant's physician, to determine residual

22  functional capacity." *Vertigan v. Halter*, 260 F.3d 1044, 1049 (9th Cir. 2001).  In doing so the

23  ALJ must determine credibility, resolve conflicts in medical testimony and resolve evidentiary

24  ambiguities.  *Andrews v. Shalala*, 53 F.3d 1035, 1039-40 (9th Cir. 1995).

25       "In determining a claimant's RFC, an ALJ must consider all relevant evidence in the

26  record such as medical records, lay evidence and the effects of symptoms, including pain, that are

27

28

---

[5] Although a few medical notes suggest that Plaintiff may have participated in additional counselling sessions following Ms. Enterline's letter, nothing in the record provides a factual basis to support a conclusion that Plaintiff participated in psychotherapy after May 2015.

1    reasonably attributed to a medically determinable impairment." *Robbins*, 466 F.3d at 883.  *See*

2    *also* 20 C.F.R. § 404.1545(a)(3) (residual functional capacity determined based on all relevant

3    medical and other evidence).  "The ALJ can meet this burden by setting out a detailed and

4    thorough summary of the facts and conflicting evidence, stating his interpretation thereof, and

5    making findings." *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (quoting *Cotton v.*

6    *Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986)).

7          The opinions of treating physicians, examining physicians, and non-examining physicians

8    are entitled to varying weight in residual functional capacity determinations. *Lester*, 81 F.3d at

9    830.  Ordinarily, more weight is given to the opinion of a treating professional, who has a greater

10   opportunity to know and observe the patient as an individual.  *Id.*; *Smolen v. Chater*, 80 F.3d

11   1273, 1285 (9th Cir. 1996).  The opinion of an examining physician is, in turn, entitled to greater

12   weight than the opinion of a non-examining physician. *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th

13   Cir. 1990).  An ALJ may reject an uncontradicted opinion of a treating or examining medical

14   professional only for "clear and convincing" reasons.  *Lester*, 81 F.3d at 831.  In contrast, a

15   contradicted opinion of a treating professional may be rejected for "specific and legitimate"

16   reasons.  *Id.* at 830.   However, the opinions of a treating or examining physician are "not

17   necessarily conclusive as to either the physical condition or the ultimate issue of disability."

18   *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999).

19         Nurse practitioners and social workers are not evaluated as if they were physicians.

20   Neither a nurse practitioner nor a social worker is considered an acceptable medical source under

21   20 C.F.R. § 404.1513.[6]  Instead, nurse practitioners and social workers are considered to be other

22   sources.  20 C.F.R. § 404.1513(d)(1) (listing medical sources that are considered other sources,

23   including nurse practitioners, physicians' assistants, naturopaths, chiropractors, audiologists, and

24   therapists).  Unlike the opinions of physicians, the opinions of nurse practitioners and therapists

25   are not entitled to special weight.  An ALJ may reject the opinions of other sources by giving

26   _____

27   [6] The Social Security Administration has recently adopted new rules applicable to claims filed after March 27, 2017, which expand the category of acceptable medical providers to include, among others, nurse practitioners.  20 C.F.R. §§ 404.1502(a)(6), (7), (8); 416.902(a)(6), (7), (8) (2017); Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844 (Jan. 18, 2017).  The revisions do not apply to Plaintiff's claim, which was filed March

28   12, 2015.

1    "reasons germane to each witness for doing so." *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir.

2    2012); *Turner v. Comm'r of Soc. Sec. Admin.*, 613 F.3d 1217, 1224 (9th Cir. 2010).  Factors used

3    to evaluate the opinions of other medical sources include: (1) examining relationship; (2) length

4    of treatment relationship and frequency of examination; (3) supportability of opinion; (4)

5    consistency with the record; (5) specialization; and (6) other factors supporting or contradicting

6    the opinion.  20 C.F.R. § 404.1527 (c) and (f)(1).

7                    **C.      The ALJ Properly Analyzed Evidence in the Record as a Whole**

8            "[A]n ALJ is responsible for determining credibility and resolving conflicts in medical

9    testimony." *Magallanes*, 881 F.2d at 750.  An ALJ may choose to give more weight to opinions

10   that are more consistent with the evidence in the record.  20 C.F.R. §§ 404.1527(c)(4) ("the more

11   consistent an opinion is with the record as a whole, the more weight we will give to that

12   opinion").

13           Having identified Plaintiff's severe impairments at step two and determined that

14   Plaintiff's anxiety and depression were not so serious as to satisfy a listed impairment, the ALJ

15   proceeded to determine Plaintiff's residual functional capacity at step four.  After summarizing

16   Plaintiff's allegations, the ALJ determined that Plaintiff's statements about the intensity,

17   persistence and limiting facts of her symptoms were unreliable and inconsistent with the objective

18   medical evidence, examination results of record and consensus of the medical sources.  AR 26.

19   In this appeal, Plaintiff does not challenge the ALJ's assessment of the reliability of her

20   testimony.

21           The ALJ next summarized the medical evidence in the record, noting Plaintiff's cardiac

22   and circulatory disorders and orthopedic impairments.  AR 26-28.  The ALJ noted multiple

23   medical observations that Plaintiff was not in acute distress, had normal gait and station, normal

24   strength and range of motion, but also recognized several discrete instances in which Plaintiff

25   experienced tenderness and limited range of motion, specifically in her shoulder and knee joints.

26   AR 27.  Nonetheless, Plaintiff experienced varying amounts of pain and instances of limited

27   motion and function.  AR 27.  Plaintiff received pain management services.  AR 27.Plaintiff

28   complied with medication but declined physical therapy and injections and required frequent

1  encouragement to exercise and watch her diet.  AR 27.  Despite a documented history of various

2  impairments, Plaintiff had normal to near-normal examinations.  AR 28.

3       The ALJ gave little weight to the opinions of the agency physicians Drs. Ocrant and

4  Coleman concerning Plaintiff's physical function in light of Plaintiff's subsequent fall and

5  fractured wrists, which warranted a reduced exertional level from that expressed by the agency

6  physicians.  AR 28.  However, she accorded great weight to the opinions of Drs. Davis and

7  Aquino, finding those opinions consistent with Plaintiff's "limited mental health treatment and

8  Global Assessment of Functioning scores of records typically noting mild symptoms."  AR 29.

9       The ALJ gave little weight to the conclusory opinion of Nurse Moore's letter, identified as

10  having been prepared for a retirement specialist.  AR 29.  She found that Ms. Moore's opinion

11  that Plaintiff was "unable to work due to permanent disability " was inconsistent with the high

12  GAF scores noted in the treatment notes of Ms. Moore and Dr. Sievert.  AR 29.  In addition,

13  Plaintiff's treatment consisted almost entirely of anti-anxiety medication management, and the

14  reported symptoms did not indicate more than minimal limitations on Plaintiff's ability to

15  perform work.  AR 29.

16       The ALJ gave little weight to the function report of Plaintiff's husband, which was

17  inconsistent with the objective record, other opinions in the record and the objective evidence.

18  AR 29.  The ALJ did not comment on Ms. Enterline's letter.

19       In assessing her own residual functional capacity, Plaintiff would interpret her symptoms

20  and treatment differently.  The Court is not required to accept Plaintiff's characterization of her

21  treatment records or the severity of her impairments.  The ALJ fully supported her determination

22  based on the medical opinions and the evidence of record.  Even if this Court were to accept that

23  the record could support Plaintiff's opinion, the record amply supports the ALJ's interpretation as

24  well.  When the evidence could arguably support two interpretations, the Court may not substitute

   its judgment for that of the Commissioner.  *Jamerson*, 112 F.3d at 1066.

25  ///

26  ///

27  ///

28

**XI.** **Plaintiff's Ability to Perform Her Prior Work Appropriately Reflected Her Residual Functional Capacity**

Finally, Plaintiff contends that the ALJ erred in determining at step five that Plaintiff's residual functional capacity enabled her to perform her prior work.  The Commissioner responds that having correctly determined Plaintiff's residual functional capacity, the ALJ appropriately relied on the vocational expert's testimony that Plaintiff could perform her prior work.

After determining a claimant's residual functional capacity, the ALJ must determine whether the claimant can perform the demands of her previous employment or other work available in the national economy.  *Gilder v. Berryhill*, 703 Fed. Appx. 597, 598 (9th Cir. 2017). If the ALJ finds that the claimant's residual functional capacity enables the claimant to perform any of her past employment, the ALJ will determine that the claimant can do her past relevant work and is not disabled.  40 C.F.R. § 404.1560(a)(3).  The ALJ determines whether the claimant can perform her past relevant work by comparing the demands of the former work with the claimant's residual functional capacity.  *Villa v. Heckler*, 797 F.2d 794, 797-98 (9th Cir. 1995?). In doing so, the ALJ must make findings of fact concerning the claimant's residual functional capacity, the physical and mental demands of the claimant's past relevant work and whether the claimant can return to the former type of work either as actually performed or as generally performed in the national economy.  *Lewis v. Barnhart*, 281 F.3d 1081, 1083 (9th Cir. 2002).

The claimant bears the burden of proving her inability to perform her prior type of work and not just her former job.  *Villa*, 797 F,2d at 798.  Although the claimant is generally the primary source for determining how her prior job was actually performed (S.S.R. 82-62), the ALJ may determine how the job is generally performed by relying on the Dictionary of Occupational Titles (DOT) or the testimony of the vocational expert.  *Johnson v. Shalala*, 60 F.3d 1428, 1435 (9th Cir., 1995).

In this case, the ALJ considered the Plaintiff's testimony concerning the nature of three prior jobs: policy holder information clerk, accounting clerk and eligibility worker.  AR 29-30. The ALJ relied on the vocational expert's testimony, which was consistent with the DOT, to conclude that Plaintiff could perform all three prior jobs both as described by the DOT and as Plaintiff testified that she performed them.  AR 30.

Plaintiff's contention is not that the ALJ erred in performing the step five analysis, but erred in determining her residual functional capacity and that if properly determined, the ALJ could not have concluded that Plaintiff could perform her past relevant work.  Having affirmed the ALJ's determination of Plaintiff's residual functional capacity, which was based on substantial credible evidence in the record as a whole, the Court finds that the ALJ did not err in determining at step five that Plaintiff could perform her past relevant work.

## XII.   Conclusion and Order

Based on the foregoing, the Court finds that the ALJ's decision that Plaintiff is not disabled is supported by substantial evidence in the record as a whole and is based on proper legal standards.  Accordingly, this Court DENIES Plaintiff's appeal from the administrative decision of the Commissioner of Social Security. The Clerk of Court is directed to enter judgment in favor of Defendant Andrew Saul, Commissioner of Social Security, and against Plaintiff Bertha Ann Longoria.


IT IS SO ORDERED.

Dated:   **June 29, 2020**                              **/s/ Gary S. Austin**
                                             UNITED STATES MAGISTRATE JUDGE